# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 12 C 50003 | **DATE** | 6/17/2013 |
| **CASE TITLE** | Vangsness, et al. vs. Deutsche Bank National Trust Co., et al. | | |

**DOCKET ENTRY TEXT:**

For the reasons stated below, defendants' motion to dismiss is denied. Plaintiffs, plaintiffs' counsel and defense counsel are ordered to appear before the court on June 26, 2013 at 9:00 a.m. to discuss the status of this case.

*Philip G. Reinhard*

■ [ For further details see text below.]   Electronic Notices.

## STATEMENT - OPINION

Plaintiffs, Corwin J. Vangsness and Carolyn Vangsness, bring this action against defendants, Deutsche Bank National Trust Co., as trustee for Morgan Stanley Home Equity Loan Trust 2007-1 ("Bank") and Saxon Mortgage Services, Inc. ("Saxon"). The amended complaint alleges violations of the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1 et seq. ("ICFA"), for fraud and deception (Count I) and unfair conduct (Count II) and violation of the federal Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2605(e) (Count III). Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1367. Defendants move to dismiss all counts.

The court previously granted in part and denied in part a motion to dismiss by the defendants. The court denied defendants' motion to dismiss the RESPA claim as it related to an alleged qualified written request received by Saxon on October 6, 2009 ("QWR"). Defendants unsuccessfully sought dismissal of this claim based on the Rooker-Feldman doctrine, claim preclusion (res judicata) and on judicial estoppel grounds. Defendants now seek to dismiss this same claim, set forth in Count III, on other grounds – that the alleged QWR was only sent by Corwin so Carolyn has no claim, that Bank is not alleged to be a servicer and never received the QWR, that document is not a qualified written request under RESPA, that it was properly acknowledged and responded to, and that plaintiffs suffered no actual damages.

The court is not going to consider serial motions to dismiss on this issue. The QWR document at issue was included in the exhibits submitted by defendants in support of their first motion to dismiss and was identifiable from the allegations in the original complaint. Defendants could have advanced their current arguments in their first motion to dismiss but chose not to and relied on the Rooker-Feldman doctrine, claim preclusion and judicial estoppel instead. Any further attack on the RESPA claims related to the QWR will have to wait for a summary judgment motion or trial.

As to Counts I and II, the elements of a claim under ICFA are 1) a deceptive or unfair act or practice by the defendant; 2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; 3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce; and 4) the defendant's conduct is the proximate cause of plaintiff's injury. Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 574 (7th Cir. 2012).

In its prior order, the court directed plaintiffs to plead their ICFA claims in separate counts, one for the claims based on fraud and deception and the other for claims based on unfair conduct. Claims for violation of ICFA as to fraud and deception, "are subject to the same heightened pleading standards as other fraud claims; as such they must satisfy the particularity requirement of Rule 9(b)." Greenberger v. GEICO General Ins. Co., 631 F.3d 392, 399 (7th Cir.

2011). Claims under ICFA as to unfair conduct are not subject to the heightened pleading standard and only require conformance to Rule 8 standards. Windy City Metal Fabricators & Supply, Inc. v. CIT Technology Financing Services, Inc., 536 F.3d 663, 670 (7th Cir. 2008). While defendants cite Avery v. State Farm Mut. Auto. Ins. Co., 835 N.E.2d 801 (Ill. 2005) as setting the pleading standard for an ICFA claim, it is the federal pleading standards that apply in an ICFA case in federal court. Windy City, 536 F.3d at 672.

Plaintiffs' amended complaint asserts an ICFA fraud and deception claim in Count I and an ICFA unfair conduct claim in Count II. The factual allegations in each count are identical. Plaintiffs executed a note secured by a mortgage on their personal residence in October 2006. Bank is the trustee of the trust that holds this note and mortgage. In 2009, plaintiffs sought to modify the terms of this loan. Plaintiffs negotiated with Saxon (the loan servicing agent for Bank) concerning a modification. In July 2009, Carolyn called Saxon concerning the process for modifying the loan to reduce payments. A Saxon employee promised to send this information but nothing was ever sent. In August 2009, Carolyn again called Saxon because she had not received any information. Later that month, plaintiffs received a letter from Saxon. In September 2009, Carolyn called Saxon with questions and to provide financial information to complete plaintiffs' personal financial statement. She did not hear back from Saxon and called several weeks later to check on the status of the modification request but there was no answer. Early in October 2009, Carolyn sent a complete packet of information by certified mail to Saxon. Later in October 2009 Carolyn spoke with Jeremy or Jerry at Saxon. He told her plaintiffs qualified for the HAMP program and that the process was expected to take up to sixty days to complete. At some point in the process an employee of Saxon told plaintiffs by telephone that defendants would not proceed with foreclosure as long as the negotiations process continued.

On October 22, 2009, plaintiffs filed a Chapter 7 bankruptcy petition. Plaintiff called Saxon and spoke to Brad who told her to fax an authorization from plaintiffs' bankruptcy counsel to allow contact between Saxon and plaintiffs. The authorization was faxed on October 27, 2009. Carolyn called Saxon shortly after and was told Saxon had no record of the authorization. She was transferred to Brad who said he would get it into the right program so it would be in the system. Shortly thereafter, defendants moved to modify the automatic stay in bankruptcy to allow foreclosure. Carolyn called Saxon and was told that the order for modifying the automatic stay was just a formality and was told by Jeremy or Jerry that Saxon was still reviewing the loan modification request but were delaying it because the government was not starting the HAMP program until December. He told her to call back in mid-January. She called back then and was advised Jeremy no longer worked there and that they had no access to his files. A Ms. Dawkins told her to submit everything all over again and that it would take from sixty to one hundred twenty days for the modification to be completed.

On January 31, 2010, plaintiffs faxed all the information to Linda Dawkins directly at Saxon. The fax transmission was confirmed. Carolyn called Dawkins around mid-March. Dawkins said she never received the fax and that an appraisal would have to be done because the last one, done around November 2009 was outdated. The only packet Dawkins said she had was one from October/November 2009, which was the same packet she previously said she could not access. Dawkins told Carolyn that if plaintiffs did not qualify for HAMP they could be put in a Saxon modification which was described as a much better program. Plaintiffs were required to fax all of the same forms and information to Saxon once again. They faxed it directly to Dawkins on March 31, 2010.

Shortly after this fax was sent, plaintiffs received a letter from Saxon stating their loan had been transferred effective April 15, 2010. Plaintiffs called Dawkins and left numerous messages but never received any response. Eventually, plaintiffs spoke with someone from Saxon who advised their information would be forwarded to Ocwen, the new loan servicer and that a new timeframe for completion would be created. When plaintiffs contacted Ocwen they were informed that Ocwen only had the second mortgage on their residence and that the first mortgage was likely still with Saxon. Ocwen said they had received no information on any modification. Plaintiffs attempted to re-contact Dawkins, left two messages but received no response. During the July 2009 to March 2010 period, plaintiffs sent four sets of financial packages to Saxon including financial statements and loan modification applications.

In March 2010, while plaintiffs were engaged in the loan modification process as describe above, Bank filed a mortgage foreclosure action against plaintiffs in state court. On July 7, 2010, plaintiffs and Bank appeared in court and Bank's motion for summary judgment of foreclosure was granted. Bank's counsel told plaintiffs that a judgment of foreclosure would not enter until October 2010, to allow plaintiffs time to negotiate for modification of their loan payments. Plaintiffs retained counsel in September 2010. Plaintiffs' counsel discovered a judgment of foreclosure had been entered July 7, 2010.

Plaintiffs allege defendants engaged in the above described fraudulent and unconscionable conduct in order to accelerate the foreclosure process to obtain title to plaintiffs' property through unlawful means. Specifically, defendants intentionally misled plaintiffs into believing defendants would not proceed with foreclosure during loan modification discussions and plaintiff relied on these representations. Defendants failed to properly document and process paperwork or communicate with plaintiffs as a result of their standard operating procedures and business practices.

"Under Federal Rule of Civil Procedure 9(b), the [plaintiff has] to state with particularity the circumstances constituting fraud. This ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." AnchorBank, FSB v. Hofer, 649 F.3d 610, 615 (7th Cir. 2011). The complaint must paint "a sufficiently detailed picture of the alleged scheme." Id.

Here, the alleged fraudulent and deceptive acts were a series of representations by Saxon employees and one by Bank's attorney which were false. Bank's attorney told plaintiffs no judgment of foreclosure would be entered until October 2010 when, in fact, a judgment was entered on July 7, 2010, the very day Bank's attorney was making this representation to plaintiffs. Previously, a Saxon employee had represented to plaintiffs that defendants would not proceed with foreclosure as long as the modification negotiations continued and that the motion for relief from the automatic stay in plaintiffs' bankruptcy to allow Bank to foreclose was "just a formality." The rest of the acts, as detailed above, involved Saxon employees promising action on plaintiffs' modification request but not taking the action, refusing to respond to plaintiffs calls about the status of the promised actions, and claiming not to have received information from plaintiffs, or not being able to access that information, when Saxon actually had the information in its possession. Plaintiffs also allege Saxon told them their loan had been transferred, that Ocwen would be their new loan servicer, and that the information concerning their modification would be forwarded to Ocwen, when, in fact, Saxon had not transferred the loan servicing to Ocwen and continued to be the servicer of plaintiffs' loan. All of these actions are alleged to have been undertaken to accelerate the foreclosure process so Bank could obtain title to plaintiffs' property. The protracted loan modification process, with all of its delays and misrepresentations, the statement that the motion for relief from the automatic stay was "just a formality", and Bank's attorney's statement on July 7, 2010 that a foreclosure judgment would not be entered until October 2010 were all part of a scheme to get Bank plaintiffs' house. These actions are alleged to have damaged plaintiffs by causing them emotional distress, depressing the value of their home, impairing their ability to sell their home, and forcing them to incur attorney's fees to defend against the foreclosure after discovering a judgment of foreclosure had been entered.

Defendants argue these allegations are insufficient for a number of reasons. They argue Bank and Saxon are improperly lumped together in the allegations and that Bank is not alleged to have done "much of anything other than exist as a plaintiff in a foreclosure action." However, Bank's attorney is alleged to have made the false representation on July 7, 2010 that a foreclosure judgment would not be entered until October 2010 when the judgment was actually entered on the date the attorney made this statement. It is clear from the complaint, as set forth above, which defendant is alleged to have taken which actions.

Defendants argue Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547 (7th Cir. 2012) precludes plaintiffs' ICFA claims. Defendants maintain Wigod only allows an ICFA claim to go forward where the plaintiff has entered a Trial Period Plan ("TPP") under the Home Affordable Modification Program ("HAMP"). In Wigod, the plaintiff had entered a TPP with defendant. The court held plaintiff could maintain a breach of contract claim for breach of the TPP. It also held plaintiff could maintain an ICFA claim.

Defendants argue footnote 4 in Wigod limits ICFA claims to situations where a TPP has been entered. Viewing the context in which footnote 4 appears, defendants are reading too much into it. Footnote 4 appears at the end of the following passage: "We first examine whether Wigod has adequately pled viable claims under Illinois law, and we conclude that she has done so for breach of contract, promissory estoppel, fraudulent misrepresentation and violation of ICFA. We then consider whether federal law precludes Wigod from pursuing her state-law claims, and we hold that it does not." Id. at 559. Footnote 4 then discusses the three types of theories that have been used in HAMP-related lawsuits and notes that courts have generally not allowed claims directly under HAMP and those based on a third-party beneficiary theory (plaintiffs as third-party beneficiaries of loan servicers Servicer Participation Agreements ("SPAs") with the government. It goes on to note a significant split concerning cases where the claims were based directly on TPP Agreements – some allowing breach of contract claims based on the TPPs and on tort or

| STATEMENT - OPINION |
|---|

state consumer fraud statutes – and some dismissing such claims. Id. That is the end of footnote 4. Wigod then moves on to allow a claim for breach of the TPP contract and ICFA claims. While the facts in Wigod were that a TPP existed, it is too big a stretch to say Wigod limits ICFA claims exclusively to cases where a TPP has been entered. Footnote 4 cannot be fairly read to impose such an exclusion.

    Defendants also argue plaintiffs' ICFA claim fails because the complaint does not allege defendants engaged in deceptive acts or practices distinct from any underlying breach of contract. They contend no conduct is alleged that is distinct from the underlying mortgage dispute. They maintain, citing Greenberger, 631 F.3d at 399, that a deceptive act or practice must involve more than the mere fact a defendant promised something and then failed to do it.

    Greenberger was an action against an insurer alleging the insurer "systematically omits necessary repairs from its collision-damage estimates in violation of the promise to restore the policyholder's vehicle to its preloss condition." Greenberger, 631 F.3d at 394. Plaintiff, Greenberger, alleged the insurer "never intended to restore his car to its preloss condition and failed to disclose that it regularly breaches this contractual promise." Id. at 395. "These are breach-of-contract allegations dressed up in the language of fraud." Id. Greenberger was seeking to enforce the terms of his insurance contract. The consumer-fraud and contract claims rested on the same factual foundation – the insurer's failure to restore the vehicle to its preloss condition as called for in the contract. Id. at 399.

    Here, the alleged misrepresentations are not about the terms of a contract. The misrepresentations involve Bank's intention to foreclose, its obtaining a judgment of foreclosure while saying it would not obtain a judgment until a later date, and various statements by Saxon employees to deceive plaintiffs into believing a loan modification was forthcoming when in fact only a foreclosure was intended. Greenberger does not preclude the ICFA claims.

    The elements of a claim under ICFA are 1) a deceptive or unfair act or practice by the defendant; 2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; 3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce; and 4) the defendant's conduct is the proximate cause of plaintiff's injury. Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 574 (7th Cir. 2012). The allegations, as set forth above, adequately allege claims under ICFA that meet the particularity requirements of Rule 9(b) for their fraud and deception claims in Count I. These same allegations, repeated in Count II, also satisfy the lesser Rule 8 standard for their unfair practices claims.

    For the foregoing reasons, defendants' motion to dismiss is denied. Plaintiffs, plaintiffs' counsel and defense counsel are ordered to appear before the court on June 26, 2013 at 9:00 a.m. to discuss the status of this case.